**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**Cory CANZATER** | Crim. No. 18-578 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

The defendant, Cory Canzater, was found guilty by a jury of conspiracy to distribute 1 kilogram or more of heroin and 28 grams or more of cocaine base, contrary to 21 U.S.C. §§ 841(a) and (b)(1)(A) & (B), in violation of 21 U.S.C. § 846, as well as two substantive distribution counts, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(C). The conviction was upheld on appeal to the U.S. Court of Appeals for the Third Circuit. (DE 212, 213) Mr. Canzater has served nearly 17 months of his 120-month term of imprisonment, and is currently incarcerated at FCI Coleman Low in Sumterville, Florida. He has now filed a motion (DE 216) seeking compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), citing the danger of a COVID-19 infection while incarcerated, given his preexisting health conditions. The government has filed a response (DE 223 (cited as "Gov't Brf.")), attaching a sealed copy of various prison records, including medical records. (DE 223-2, cited by stamped page number as "G __".) For the reasons stated below, the motion is denied.[1]

---

[1] Section 3582(c) provides that a court may modify a term of imprisonment only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The government notes that Mr. Canzater may "technically" have failed to satisfy the exhaustion requirement. (Gov't Brf. 2) He submitted a petition to

I. **LEGAL STANDARDS**

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies

---

the Warden of Coleman Low which was rejected on grounds the government describes as technical. (DE 216 at 18–23) It is undisputed that more than 30 days has elapsed since that submission. Mr. Canzater could have done more to fairly place his contentions before the BOP. Still, the government addresses the motion on the merits, and the Court will do so as well.

with the § 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D). The application note lists three specific circumstances that the BOP may find extraordinary and compelling, which I summarize:

a) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover;

b) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or

c) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner.

U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

That policy statement was enacted at a time when only the BOP could consider an application for compassionate release, however, and has not been amended since the enactment of the First Step Act conferred certain powers on the courts. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by the application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

3

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus, the Guidelines policy statement, while it may limit BOP discretion, does not limit what this Court may reasonably find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ––– U.S. –––, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

4

I therefore am guided by the policy statement, but consider the grounds asserted by the defendant, whether or not specifically authorized by the policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if defendant were released.

## II. DISCUSSION

### A. Extraordinary and compelling circumstances

Mr. Canzater's First Step Act application for reduction of sentence rests primarily on the danger to his health while he is in the institutional setting of FCI Coleman Low. He alleges the following preexisting health conditions: obesity, progressive osteoporosis, hypertension, diabetes, and bipolar mood disorder. He claims that these conditions, when coupled with the danger of contracting a COVID-19 infection under the conditions prevailing at FCI Coleman Low, set forth extraordinary and compelling circumstances warranting his release. He also alleges certain other grounds, based on the need to care for his mother and on constitutionally substandard prison conditions, which I discuss separately below.

I emphasize what is sometimes obscured in discussions of such First Step Act applications: A federal prisoner, like anyone else, may be in poor health, and may suffer from ailments that would plague a person whether in or out of prison. One must ask whether there is something about *incarceration* that so *increases* the risk to the prisoner as to set forth extraordinary and compelling circumstances. I therefore consider (1) the risk, for someone with Mr. Canzater's medical conditions, that a COVID-19 infection would carry serious consequences; (2) the effect of vaccination on the likelihood of Mr. Canzater's contracting a serious COVID-19 infection; and (3) COVID-19 infection rates at FCI Coleman Low.

#### 1. Defendant's medical risk factors

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at

5

particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated as of May 2, 2022) (cited herein as "CDC List"). "Older adults," i.e., those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 81% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors for serious consequences from a COVID-19 infection. *Id.*[2] By "serious consequences," the CDC mean hospitalization, intensive care, being placed on a ventilator, or death. *Id.* I consider Mr. Canzater's various conditions in light of the CDC List and the medical evidence.

Certain conditions may be set aside or discounted at the outset, because they are not on the CDC List, because Mr. Canzater does not have them at all, or because he greatly exaggerates their seriousness.

Mr. Canzater, aged 49, is not an "older adult," and will not be one at the time of his presumptive release date.

*Diabetes* appears on the CDC List, but the medical records do not support Mr. Canzater's self-diagnosis. During medical visits on January 21 and 29, 2021, he "Denied" having diabetes. (G 21, 28) On November 22, 2021, a lab report indicated a hemoglobin level of 6.0, which is associated with no more than a "risk" of diabetes, warranting further monitoring. (G 175–76)

*Osteoarthritis* does not appear on the CDC List. Mr. Canzater does have this condition, however; the medical records support a diagnosis of "severe left hip osteoarthritic changes." (G 83, 102) With sympathy, I note that this condition is an unfortunate and painful fact of life for Mr. Canzater; there is no

---

[2] The list, in abbreviated form, consists of Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

6

indication, however, that he is any more endangered by it in prison than he would be out of prison. The government cites numerous cases in which applications for release based on osteoarthritic conditions, even in elderly patients and in combination with other serious ailments, have been denied.[3] Surgery may or may not be indicated (there is no medical opinion to that effect); if so, it will presumably occur at an institution designated by the BOP. Mr. Canzater states that he would like to be released so that he can have hip replacement surgery at Richland Hospital in Columbia, South Carolina. He points to nothing unique about the services available at that hospital; its only distinguishing feature seems to be proximity to his mother, who is being treated there. There is no evidence that Mr. Canzater's condition cannot be treated while he is incarcerated, and his desire to be treated at a preferred institution is not extraordinary and compelling.

  *Bipolar mood disorder* may fall within the CDC List's category of "Mental

---

[3]  *United States v. Gist*, No. 4:19-CR-3-CDL-MSH, 2021 WL 5927645, at *2 (M.D. Ga. Nov. 16, 2021), *report and recommendation adopted*, No. 4:19-CR-3 (CDL), 2021 WL 5921375 (M.D. Ga. Dec. 15, 2021) (denying compassionate release for prisoner who suffered from numerous conditions, including, osteoarthritis in her hip, as well as obesity, anxiety, hypertension, in part, because "the medical records show that Defendant has received consistent and appropriate treatment for her conditions while incarcerated"); *United States v. Reychler*, No. 18-04-BU-DLC-03, 2021 WL 5113486, at *2 (D. Mont. Nov. 3, 2021) (denying compassionate release to 73- year-old man who sought hip surgery for osteoarthritis and who suffered from chronic obstructive pulmonary disease, hypertension, an enlarged prostate, and obesity, noting that, "[h]is hip issue is no doubt painful, but he does not show it is unusual or extraordinary"), *aff'd*, No. 21-30225, 2022 WL 874641 (9th Cir. Mar. 24, 2022); *United States v. Carbonaro*, No. 02 CR. 743-05 (CM), 2021 WL 3188310, at *3 (S.D.N.Y. July 28, 2021) (denying compassionate release to 73-year old who "is not a well man" and suffered from rheumatoid arthritis, osteoarthritis, asthma, anemia, hypoglycemia, and cataracts, and who "may require bilateral hip replacement," and lives with a "loop recorder" in his chest to monitor his heart, because he had recovered from COVID, had received a first dose of the vaccine, and was scheduled to receive the second dose).

(Gov't Brf. 12)

Health Conditions": "Having mood disorders, including depression, and schizophrenia spectrum disorders can make you more likely to get very sick from COVID-19." (CDC List) There is little indication of any serious mental health condition in Mr. Canzater's medical records, however.

Mr. Canzater claims he was diagnosed with bipolar mood disorder prior to incarceration. In his Presentence Report, however, he denied any mental health conditions, other than normal depression about his impending incarceration (PSR ¶ 146); at an early prison medical assessment, on January 24, 2021, he reported no mental health conditions, and none were observed or diagnosed. (G 23) A prison medical record from April 21, 2021, reports that he was "very depressed and anxious," particularly about loved ones he had left behind when he went to prison. He was diagnosed with major depressive disorder, single episode, anxiety disorder. He was prescribed Zoloft, a common antidepressant (50 mg daily, a common initial dose). (G 12) Following that depressive "single episode," he was diagnosed with anxiety disorder on an ongoing basis. On January 26, 2022, his mood and affect were found "appropriate" and his thought content "within normal limits." (G 102) A report from February 25, 2022, indicates that he had failed to pick up his medications (the prescribed Zoloft dosage had been increased in the interim), and notes a discussion of the necessity of "medication compliance and healthy lifestyle." (G 96) In short, there is no indication that Mr. Canzater suffers from the claimed condition of bipolar disorder. Out of caution, I have examined the evidence of anxiety or depression, but find nothing extraordinary.

Two of Mr. Canzater's claimed conditions, however, both appear on the CDC List and have substantial support in the medical evidence.

*Obesity* appears on the CDC List as a risk factor. Being overweight (BMI $\geq 25$), obese (BMI $\geq 30$), or severely obese (BMI $\geq 40$) "can make you more likely" to suffer severe consequences as a result of a COVID infection. *See* CDC List. Mr. Canzater is 6'1" tall. On April 21, 2021, he weighed 256 pounds (G 102), corresponding to a BMI of 33.8, in the obese but not severely obese range. Thereafter, however, he quickly gained weight; for example, he weighed 325

8

pounds on October 25, 2021 (G 123), and 318 pounds on April 15, 2022. (G 137) As of that latter date, his BMI would be calculated as 42, in the severely obese range.[4] Beginning in February 2022, he has received counseling regarding proper diet and weight loss.

*Hypertension* appears on the CDC List, though in somewhat equivocal form. The CDC List names certain heart conditions as risk factors, and then adds that "*possibly* high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." (CDC List, "Heart Conditions"; emphasis added). Mr. Canzater's medical records indicate that he has no cardiopulmonary complications. The records do, however, corroborate a diagnosis of hypertension, for which he takes prescribed medication. He has received regular and appropriate care (some fifteen medical appointments since his sentence began). His most recent blood pressure readings, from his appointments on January 26, February 25, March 4, April 5, and April 15, 2022, were 135/86, 172/97,[5] 144/83, 150/96, and 136/90. These systolic readings fall in the hypertension Stage 1 (130–39) or Stage 2 (140–180) ranges, and the diastolic readings are of similar severity.[6]

In short, the defendant claims a number of medical complaints, two of which (and perhaps to some degree a third, depression/anxiety) are recognized as risk factors for serious consequences from a COVID-19 infection. Medical records reveal that Mr. Canzater has received counseling in connection with his obesity. He has, through his own conduct, aggravated that preexisting condition while incarcerated, but the Court is cognizant of the challenges of weight control. For his hypertension, he has received regular and appropriate

---

[4]   *See* CDC, Adult BMI Calculator, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html.

[5]   This high reading corresponds to the visit at which he reported that he had not picked up his medications and was counseled about medication compliance. (G 96).

[6]   *See* American Heart Ass'n, Understanding Blood Pressure Readings, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings

care, including medication. Even setting aside other factors such as vaccination, *see infra,* inmates with such multiple chronic, controlled conditions have regularly been denied relief.[7] I recognize, however, that these

---

7    *See United States v. Coleman*, 848 F. App'x 65, 66 (3d Cir. 2021) (upholding denial of release to inmate with "well managed" conditions of "asthma (moderate-severe), HIV, and hypertension"); *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (in pre-vaccine era, denying compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung).

Judge Wigenton has usefully summarized some relevant authority from the voluminous case law:

> Despite the risk of COVID-19, multiple decisions in the Third Circuit, and multiple decisions in this District, have denied compassionate release to inmates suffering from obesity, hypertension, and/or other health issues. *See, e.g., United States v Kenneth Irving Carter*, Crim. No. 21-1090, 2021 WL 4916189, at *1 (3d Cir. Oct. 21, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's severe obesity); *United States v. Patricia Fountain*, Crim. No. 21-1313, 2021 WL 4772957, at *1–2 (3d Cir. Oct. 13, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "obesity, concerning blood work levels, high serotonin levels, migraines resulting from adrenoleukodystrophy, cognitive decline, anxiety, depression, panic attacks, and post-traumatic stress disorder"); *United States v. Troy Wragg*, Crim. No. 20-3430, 2021 WL 4459455, at *1, *3 (3d Cir. Sept. 29, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "obesity, seizure disorder, and hypertension"); *United States v. Edward Hicks*, Crim. No. 20-3512, 2021 WL 4316829, at *1–2 (3d Cir. Sept. 23, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "asthma, pre-diabetes, hypertension, and obesity"); *United States v. Tyheed Jefferson*, Crim. No. 21-2020, 2021 WL 4279626, at *1, *3 (3d Cir. Sept. 21, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's obesity and cryptococcosis); *United States v. Lee*, Crim. No. 13-56, 2021 WL 4077562, at *2–3 (D.N.J. Sept. 8, 2021) (denying motion for compassionate release where defendant suffered from an anxiety disorder and mild hypertension); *United States v. Preschel*, Crim. No. 19-00186, 2021 WL 3930716, at *2, *4 (D.N.J. Sept. 2, 2021) (denying defendant's motion for compassionate release despite suffering from "obstructive sleep apnea, hypertension, diabetes, obesity, depression, and some kind of personality disorder"); *United States v. Germaine H. King*, Crim. No. 18-379, 2021 WL 3783157, at *4, *5 (D.N.J. Aug. 24, 2021) (denying defendant's motion for compassionate release where defendant is suffering from obesity and asthma).

10

conditions are real, and that—all other things being equal—they would increase the risk of serious consequences from a COVID infection, should that occur. I therefore consider other factors relevant to the extent of any increase to that risk as a result of being incarcerated, particularly at FCI Coleman Low.

### 2. Vaccination

The likelihood of a serious COVID-19 infection has been greatly reduced by the vaccination of Mr. Canzater and others at the prison.

It is undisputed that vaccination is freely available. BOP has made the vaccine available to all inmates under its supervision, and has administered over 318,000 doses systemwide. https://www.bop.gov/coronavirus/

Mr. Canzater initially refused the vaccine when it was offered to him on February 26, 2021. (G 87) On May 7, 2021, however, he received the initial dose of the two-dose Pfizer vaccine protocol. (G 197) The record does not reveal whether he received the second dose or any subsequent booster.

The available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection. Just as important, and perhaps more so, is that when breakthrough infections occur, the vaccines limit the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarize their effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**

---

*United States v. Brashear*, No. CR 15-00636 (SDW), 2021 WL 5239119, at *3 (D.N.J. Nov. 10, 2021).

- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

As a proxy for severity, the CDC report the following data regarding hospitalizations:

> In February [2022], compared to fully vaccinated persons in each group shown below, the monthly rates of COVID-19-associated hospitalizations were: . . .
>
> **3.2x** Higher in Unvaccinated Adults Ages 18-49 years
>
> **4.5x** Higher in Unvaccinated Adults Ages 50-64 years
>
> **5.3x** Higher in Unvaccinated Adults Ages 65 Years and Older

https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination (last visited May 2, 2022).

There are no guarantees, and breakthrough infections are a reality. It also remains true that the virus develops new variants, requiring that scientific and medical conclusions be revised. Given the current effectiveness of vaccines, however, I have often found vaccination to be a highly relevant consideration in assessing the risks associated with COVID-19 infection. (A recent example is *United States v. v. Jerez Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *3 (D.N.J. Mar. 9, 2022).) *See also United States v. Turbides-Pena*, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021) (Chesler, J.) ("Given that Defendant is fully vaccinated against Covid-19, the risk of that illness due to continued incarceration has been substantially reduced and does not constitute an extraordinary and compelling reason for a reduction in sentence."); *United States v. Stewart*, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) (noting "with the vaccine's protection . . . Defendant's susceptibility to renewed serious illness seems unlikely"); *United States v. Shumate*, 2021 WL 2374621, at *2 (D.N.J. June 9, 2021) (Hillman, J.) (citing cases and noting "it is appropriate for courts to consider the vaccination status of a defendant when considering compassionate release motions").

"Even a single dose has protective value, according to public health authorities." *United States v. Peel*, No. 14-CR-00192 KJM CKD, 2021 WL 2875658, at *2 (E.D. Cal. July 8, 2021) (citing CDC press release that a single dose of the Moderna or Pfizer vaccine reduced risk of COVID-19 infection by 80%, https://www.cdc.gov/media/releases/2021/p0329-COVID-19-Vaccines.html). Nevertheless, the recommended protocol for the Pfizer vaccine consists of two initial injections, followed by boosters.

There is no evidence either way regarding subsequent vaccinations or boosters, nor is there any explanation from Mr. Canzater. I may conclude from the lack of such evidence and the undisputed availability of the vaccine that Mr. Canzater has again refused, or at least has not sought any further vaccination. If so, that circumstance would not weigh in his favor.

The Seventh Circuit, for example, has taken a strong stance on refusal to be vaccinated, treating it as practically a disqualifier in most cases:

> [A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an "extraordinary and compelling" justification for release. The risk is self-incurred. . . . The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective . . . . A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021).

One need not fully accept the Seventh Circuit position, however, to find pertinent the observations of the U.S. Court of Appeals for the Third Circuit in a recent unreported case:

> . . . Thomas argues that his request was denied because he received the COVID-19 vaccine and this reasoning, if widely adopted, could perversely encourage inmates to decline the vaccine. We disagree. The District Court appropriately recognized

13

> that Thomas's vaccination reduced the health risks he relied on in support of his motion. This conclusion does not reward inmates who decline opportunities for vaccination. District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release. *See, e.g., United States v. Brinson*, No. CR 19-153 (SDW), 2021 WL 2451970, at *2 (D.N.J. June 16, 2021) (Wigenton, J.) ("[B]ecause Defendant was offered and refused the COVID-19 vaccine, he cannot establish that 'compelling and extraordinary reasons' justify his release." (internal citations omitted)); *United States v. Sawyers*, No. CR 15-00070-RSWL-1, 2021 WL 2581412, at *4 (C.D. Cal. June 22, 2021) ("The glaring consensus among district courts is that refusal of a COVID-19 vaccine subverts a defendant's compassionate release motion."), *appeal dismissed*, No. 21-50157, 2021 WL 6196971 (9th Cir. Oct. 18, 2021).

*United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022). In line with these *dicta* in *Thomas,* cases in this district denying compassionate relief have routinely taken into account a prisoner's refusal to be vaccinated. *See, e.g., United States v. Manon*, No. CR 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022) ("Despite being offered the COVID-19 vaccine and being "begged" by his medical provider to take the vaccine, Defendant has refused vaccination. . . . Clearly, Defendant is not in a condition 'that substantially diminishes' his ability 'to provide self-care within the environment of a correctional facility', as Defendant has rejected the opportunity for vaccination."); *United States v. Bonilla*, No. 20-0083, 2021 WL 3634181, at *2 (D.N.J. Aug. 17, 2021) (collecting cases holding that an inmate's refusal to be vaccinated in the absence of a legitimate medical reason was fatal to establishing an "extraordinary and compelling" reason for compassionate release).[8]

---

[8]   At least in this Court's experience, the situation in which the inmate permits one vaccination, but refuses a second, is less common. *But see United States v. Klinger*, No. 3:19-CR-00033-01-TMB, 2021 WL 5042986, at *4 (D. Alaska Oct. 29, 2021) (denying compassionate release where inmate took one dose of the Moderna vaccine and refused the second dose)

14

A prisoner has the right to refuse, or anyway not to seek, vaccination. To my mind such a refusal is relevant to but not dispositive of the compassionate release application. I am of course wary of creating a perverse incentive to forgo vaccination. And there is, as I observed in a recent case, reason to be skeptical of a prisoner who claims to fear for his life, yet refuses to take routine measures to protect himself against COVID-19 infection. *See United States v. Darby*, No. CR 13-631 (KM), 2022 WL 1423089, at *7 (D.N.J. May 5, 2022). If there were some particular medical contraindication or religious bar to vaccination, I might take that into account. This record discloses none.

Finally, there is another, more general sense in which vaccination reduces the risk to Mr. Canzater. At the Coleman complex, which includes FCI Coleman Low, 851 staff members and 5297 inmates have been fully inoculated.[9] *Id.* Like many a person who refuses vaccination, Mr. Canzater benefits as a "free rider" on the herd immunity of those who did not refuse vaccination. The infection statistics at Coleman Low bear out that conclusion.

### 3. Infection Rates at FCI Coleman Low

I move on to consider the current likelihood of contracting COVID-19 at FCI Coleman Low. That likelihood is low. Many infections occurred, particularly in the earlier period of the pandemic, before vaccination was widely available. In early to mid-2021, however, the prison system brought them under control, largely as a result of distancing procedures and vaccination.

FCI Coleman Low is a low security federal correctional institution with an adjacent minimum security satellite camp. Currently the facility houses a total of 1940 inmates: 1583 in the FCI, and 357 in the camp. It is currently at Operational Level 1, the lowest category of COVID-19 precautions. https://www.bop.gov/locations/institutions/col/index.jsp

Current and cumulative figures for COVID-19 infections at FCI Coleman

---

[9] Currently the facility houses 575 inmates in the prison and adjacent satellite camp. https://www.bop.gov/locations/institutions/otv/ Presumably the figure of 670 vaccinations, which exceeds the current total of inmates, reflects some turnover in the inmate population.

15

Low are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 0 | 0 | 1 | 1 | 417 | 107 |

https://www.bop.gov/coronavirus/

The "recovered" figures reveal quite substantial numbers of positive COVID test results among the inmates and staff, and one inmate death, in the past. Currently, however, the facility reports zero positive test results among inmates and staff. The same cannot be said, of course, for society at large; thus, there is no good argument that Mr. Canzater's risk of contracting a COVID-19 infection would be reduced by his release.

In short, Mr. Canzater's personal medical situation, whether taken in isolation or in the context of conditions at FCI Coleman Low, does not support a finding of compelling and exceptional circumstances.

### 4. Other claims

Mr. Canzater cites two miscellaneous factors not related to his medical condition as such. Neither sets forth extraordinary and compelling circumstances.

Mr. Canzater states that he wishes to be released to care for his mother. She is severely diabetic, that she is being treated at Richland Hospital in South Carolina, where she lives, and that he has been a caregiver for her.

"Although the FSA provides for compassionate release on such grounds, relief is only appropriate where it can be shown that family members, including minor children, are in dire need of a defendant's caregiving and other family members are afflicted by incapacitating, life-threatening illnesses." *United States v. Nelson*, No. CR 18-300 (SDW), 2021 WL 2253524, at *2 n.3 (D.N.J. June 3, 2021) (internal quotations omitted) (finding release for family care was not appropriate because "Defendant has provided no information about who has been caring for the child since then, the ability of other family members to look after him, or any other support for his claim that he should be released in order to be his son's caregiver"). An instructive comparison is my own case of

16

*United States v. Dunich-Kolb*, No. CR 14-150 (KM), 2022 WL 580919, at *9 (D.N.J. Feb. 14, 2022), in which the defendant had lived with his ailing parents and been his mother's caregiver for years, his father had died in the interim, the evidence demonstrated that no one else was available to care for her, and the reduction awarded represented the final 12 months of a 72-month sentence.

Mr. Canzater has made no such showing. His vague statement that he was "a caregiver" for his mother in South Carolina does not establish that his constant presence is required, or that no other arrangements are available. (He was, for example, in Newark, New Jersey when he engaged in the criminal offense conduct.) He acknowledges that his mother is being cared for at Richland Hospital in South Carolina. Apparently, resources are not lacking; seeking to be released for hip replacement surgery at Richland Hospital, he states that his mother will pay for his medical expenses there. (DE 216 at 3–4 ¶ 7)

Also included in Mr. Canzater's motion is an addendum that criticizes conditions at the prison in general: in particular, the COVID lockdown, the lack of exercise facilities, and the lack of sufficient medical care. Such factors apply, more or less, to the entire prison population and cannot be regarded as extraordinary. At any rate, whatever the lockdown situation may have been in pre-vaccination days, Coleman Low is now at Operational Level 1, the lowest classification of COVID-based restrictions. The allegation of inadequate medical care is implausible on its face, given the extensive records of conscientious and appropriate care that he has received. His portrayal of Coleman Low as a dangerous disease incubator is belied by the actual COVID infection figures cited above. He self-prescribes hip replacement surgery, but he cites no medical opinion that surgery is indicated or feasible, and, as noted above, his desire to elect surgery at a particular hospital is not a basis for release.

### B. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the factors under 18 U.S.C. § 3553(a) would weigh against an order of release. *See*

17

*generally United States v. Doe,* 833 F. App'x 366 (3d Cir. 2020). I have considered all of the § 3553(a) factors.

The offenses of conviction are serious ones. Mr. Canzater was convicted by a jury for his role in a conspiracy that moved large quantities of heroin and cocaine base. Text and telephone messages documented his daily involvement as a "runner," or go-between, in addition to his direct participation in drug sales. Aside from the larger conspiracy, of which he had full knowledge, the jury found him guilty of personally possessing with intent to distribute heroin and cocaine base. In a particular two-week period, he personally was responsible for selling over 100 grams of controlled substances. Mr. Canzater had a criminal record, largely consisting of state drug-related offenses, that placed him in Sentencing Guidelines Category IV. Prior sentences, the longest of which was three years, evidently failed in their deterrent purpose.

The 120-month sentence this Court imposed was the shortest available—the statutory minimum for a conspiracy involving at least one kilogram of heroin. It is not out of proportion with other sentences for similar conduct; indeed, it represented a downward variance from the applicable Guideline range of 135 to 168 months. I found at the time of the sentence that it served the goals of reflecting the seriousness of the offense, respect for the law, and a just measure of punishment. Both the defendant himself and like-minded others need to be deterred from placing dangerous drugs on the street in Newark, a community plagued by drug dealing, and the public needs to be protected from such conduct.

Not much of significance has changed since I made the necessary § 3553(a) findings in connection with imposition of sentence. Most importantly, Mr. Canzater has not discharged a large percentage of his sentence. As of April 27, 2022, about a month ago, the BOP calculated that Mr. Canzater had served 16 months, or approximately 13.3% of the sentence imposed. His projected release date, assuming all good time credits, is July 5, 2029; on that assumption, he has served some 15.6% of his sentence. (DE 223-2 at 6) It is true that Mr. Canzater has participated in some rehabilitation programs, and

18

that is to be applauded. Release at the present time, however, would unacceptably undercut nearly all of the goals of sentencing as set forth in § 3553(a).

In sum, even if Mr. Canzater's circumstances were extraordinary and compelling, which I do not find to be the case, compassionate release would be denied because it would not be consistent with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).[10]

## ORDER

**IT IS THEREFORE** this 20th day of May, 2022,

**ORDERED** that the motion for compassionate release (DE 216) is **DENIED**. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Cory Canzater, by regular first-class mail, and close the file.

/s/ Kevin McNulty

_____
**KEVIN MCNULTY, U.S.D.J.**

---

[10] To the extent that Mr. Canzater may be arguing in the alternative for transfer to home confinement, the application must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). And if the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above.